**ORANGE AND ROCKLAND UTILITIES, INC., Plaintiff,**

v.

**HOWARD OIL COMPANY, INC., Defendant.**

### No. 76 Civ. 1136 (CHT).

United States District Court, S. D. New York.

June 14, 1976.

LeBoeuf, Lamb, Leiby & MacRae, New York City, for plaintiff; Taylor R. Briggs, E. Michael Joye, New York City, of counsel.

Shea, Gould, Climenko, Kramer & Casey, New York City, for defendant; Ronald H. Alenstein, Geoffry R. Handler, New York City, of counsel.

## MEMORANDUM

TENNEY, District Judge.

Defendant Howard Oil Company, Inc. ("Howard") seeks an order of this Court pursuant to Rules 12(b) and 26(c) of the Federal Rules of Civil Procedure: (1) dis-

missing or staying this action upon the grounds (a) that this action is barred under the doctrines of primary administrative jurisdiction and exhaustion of administrative remedies, (b) that plaintiff has failed to join an indispensable party, and (c) that there is another action pending between the same parties, wherein plaintiff seeks most of the same overcharges alleged herein; and (2) staying discovery pending the determination of this motion. For the reasons set forth below, the Court will order the trial of this action stayed pending the prior ruling of the Federal Energy Administration regarding the issues raised herein.

### Facts

Plaintiff, Orange and Rockland Utilities, Inc. ("O&R"), is a New York corporation with its principal place of business located at Spring Valley, New York. Plaintiff is engaged in the production, distribution, and sale of electric energy to the citizens of Orange, Rockland, and Sullivan Counties, New York. In the generation of electric energy, plaintiff depends almost entirely on No. 6 residual fuel oil for fuel. Defendant, Howard, is also a New York corporation with its principal place of business located in Queens, New York. Defendant is engaged in the transport, storage, and sale of petroleum products, including No. 6 residual fuel oil.

Plaintiff produces most of its electricity at two generating plants: the Lovett Plant located at Tompkins Cove, New York, and the Bowline Plant located at Haverstraw, New York. In 1971, defendant entered into two contracts for the supply of fuel oil to these two plants. These contracts are known by the parties as the "Lovett contract" dated January 1, 1971, and the "Bowline contract" dated September 1, 1971. These 1971 contracts continued to be in full force until 1973 when defendant contended that its fuel supply had been so interrupted that it had to invoke the *force majeure* provision of the contract to relieve it of its obligation to plaintiff under the 1971 contracts. Consequently, the parties entered into a so-called "best efforts" agreement whereby defendant agreed to supply fuel oil to plaintiff on a "best efforts" basis. This latter contract was to run from January of 1974 through December of 1976.

In December of 1975, plaintiff commenced an action against defendant in the New York State Supreme Court for Rockland County. In this action plaintiff sought damages for breach of the "Lovett" and "Bowline" contracts, for fraudulently inducing plaintiff to enter into the "best efforts" agreement, and for breach of the "best efforts" agreement. The thrust of the complaint is that defendant was not justified in invoking the *force majeure* provision of the contracts of 1971 so as to relieve it of liability under those contracts, and that by doing so with knowledge that it was not so entitled to act, defendant fraudulently induced plaintiff to enter into the "best efforts" contract. In the alternative, the complaint alleges that even if the "best efforts" contract were to be deemed to be the controlling instrument between the parties, the defendant miscalculated its prices under the latter contract and was thereby in breach of the latter agreement. The State Supreme Court action has been transferred to New York County by agreement of the parties and is pending at the present time.

The sale of fuel oil by defendant to plaintiff was controlled as to price by the provisions of the Economic Stabilization Act, 12 U.S.C. § 1904 Note, and the rules promulgated pursuant to the Act. These rules were first promulgated, in August of 1973, by the Cost of Living Council and were adopted by the Federal Energy Office on December 27, 1973. The rules which govern the maximum lawful price which may be charged by a reseller such as defendant are codified in 10 C.F.R. § 212.93.

On February 23, 1976, the Federal Energy Administration ("FEA") issued a Notice of Probable Violation to defendant following an audit of defendant's books and records. The FEA generally alleged that defendant had illegally overcharged plaintiff for fuel oil during the period November 1973 through December 1974. Under pertinent FEA regulations, defendant was law-

fully permitted to pass along certain costs to its customers such as plaintiff to the extent that these costs exceeded defendant's "weighted average inventory cost" as of May 15, 1973. Specifically, the FEA alleged that defendant had, through improper accounting practices, incorrectly calculated the weighted average inventory cost as of May 15, 1973. Since the costs which could be passed along to the fuel purchaser on a dollar-for-dollar basis included the difference between the weighted average unit cost of a product presently in inventory and the weighted average unit cost of that product in inventory on May 15, 1973, and since the calculation of the weighted average unit costs as of May 15, 1973, was improper on the low side, the result was a higher than permitted pass-through of costs to customers such as O&R. In addition, the FEA alleged that Howard had apparently mischaracterized, as part of its costs of inventory, certain transportation costs incurred in the delivery of the product to its customers. This Notice of Probable Violation was met with a denial by Howard and the investigation is ongoing.

Then, on March 9, 1976, plaintiff instituted the instant lawsuit seeking damages for a willful overcharge on the sale of No. 6 residual fuel oil to plaintiff during the period November 1973 through March 1974 in the amount of $1,277,362. The gravamen of the complaint is that, through improper accounting practices, defendant miscalculated its weighted average unit cost of inventory as of May 1973 with the result that the costs which could be lawfully passed along to the plaintiff were inflated to the extent that the base inventory was miscalculated. In addition, there is an allegation that some improper transportation costs were passed along in this calculation. Plaintiff seeks the treble damages provided for by statute in the amount of $3,832,086, together with costs and fees.[1]

The instant motion was brought on by defendant to stay or dismiss the action for a variety of previously-mentioned reasons.

*Primary Jurisdiction and Exhaustion of Administrative Remedies*

Defendant urges the Court to either dismiss this action or to stay its hand based on the doctrines of primary jurisdiction and exhaustion of administrative remedies.

█ The doctrine of exhaustion of administrative remedies is long-settled and well founded and provides "that no one is entitled to judicial relief for a supposed or threatened injury until the *prescribed* administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938) (emphasis added). The doctrine is premised upon the theory that where an administrative body has been given the responsibility for the oversight of activity under a statute and enforcement of the statute, and where that agency presumably possesses a particular expertise in the area, a court would initially defer questions within this ambit to the agency. Thus, the administrative judgment would be sought either in lieu of judicial decision-making or as a foundation for a later judicial decision.

This Court is faced, in the first instance, with the question of whether an administrative remedy has been *prescribed* by Congress under the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 Note ("the Act"), and in reaching this question the Court notes the divergence of opinion which has emerged as various courts have been faced with this question.[2] What, then, does the Act provide?

Section 207(b) of the Act, 12 U.S.C. § 1904 Note, provides in pertinent part:

"(b) Any agency authorized by the President to issue rules, regulations, or orders under this title shall, in regulations prescribed by it, establish procedures which are available to any person for the purpose of seeking an interpretation, modification, or rescission of, or seeking an exception or exemption from, such rules, regulations, and orders. If

---

1. Section 210 of the Economic Stabilization Act of 1970, codified at 12 U.S.C. § 1904 Note.

2. See discussion at pages 463–465 *infra*.

such person is aggrieved by the denial of a request for such action under the preceding sentence, he may request a review of such denial by the agency. The agency shall, in regulations prescribed by it, establish appropriate procedures, including hearings where deemed advisable, for considering such requests for action under this section."

Section 211 of the Act places exclusive jurisdiction of cases arising under the Act in the district courts of the United States. Section 210 of the Act provides for a private right of action and states in pertinent part:

"(a) Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief, including an action for a declaratory judgment, writ of injunction (subject to the limitations in section 211), and/or damages."

As stated earlier, courts faced with this statutory framework have been unable to agree upon whether the exhaustion doctrine applies. In *Templeton's Service, Inc. v. Mobil Oil Corporation*, 402 F.Supp. 368 (E.D. Mich.1975), it was noted that

"[t]he language of the Economic Act, incorporated by Congress into the Emergency Act, does not define the interplay between administrative and judicial remedies. The private right of action afforded by section 210 is fettered only insofar as section 211 of the Economic Act limits the court's injunctive power, in actions attacking the regulations themselves, to situations where the administrative agency has first considered the challenge. Thus, the statutory scheme provides for parallel rather than interdependent administrative and judicial remedies where a private party charges another with a violation of applicable regulations and does not question the regulations themselves." *Id.* at 371. (Transposition in final sentence corrected from original).

The court then went on to examine some of the legislative history applicable to the question and quoted from the Senate Report as follows:

" 'Section 210 provides a traditional method by which violators of regulations may be discovered and other would-be violators may be deterred. This can be accomplished by authorizing a person suffering legal wrong to bring a treble damage action against a violator.

" 'This action is intended to be brought by private persons against other private persons. The Government will not bring such action nor be the subject of one.' " *Id.* at 372, *quoting* S.Rep.No.92–507, 1971 U.S.Code Cong. & Admin.News, pp. 2283, 2291.

The court concluded that there was no exhaustion requirement imposed prior to the institution of suit under Section 210. *Id.* The court found that the administrative machinery was "violator, not complainant oriented", with the injured party playing the rather minor role of instigator of the investigation. *Id.* at 373.

Similarly, in *Brennan Petroleum Products Co., Inc. v. Pasco Petroleum Co., Inc.*, 373 F.Supp. 1312 (D.Ariz.1974), the court noted the private right of action created by Congress under the Act, and after examining the legislative history of the Act noted that

"[t]he Economic Act therefore provides two methods by which the act and regulations may be enforced: through the administrative process by orders and other sanctions with appeal allowed to the courts (sections 207–208, 211), and a separate private remedy directly in the district courts for injunctive and treble-damage relief (section 210)." *Id.* at 1315.

The court concluded that no exhaustion requirement applied under the Act. *Id.* *Cf. Society of New York Hospital v. Associated Hospital Service of N. Y.*, 367 F.Supp. 149 (S.D.N.Y.1973).

To the contrary is *Anderson v. Dunlop*, 485 F.2d 666 (Em.App., 1973), *cert. denied*, 414 U.S. 1131, 94 S.Ct. 871, 38 L.Ed.2d 756 (1974). There, several gasoline retailers

challenged, as discriminatory, a regulation of the Cost of Living Council regarding allowable markups on gasoline. The Court found that the administrative remedy was adequate and required exhaustion citing *City of New York v. New York Telephone Co.*, 468 F.2d 1401 (Em.App., 1972). *Id.* at 668. Neither of these cases, however, involved a private right of action under Section 210, but merely sought interpretative relief with regard to the regulation in question.

■ It is the conclusion of this Court that the Congress, in enacting Section 210, intended it to apply without regard to the applicability of Section 207. Thus, the plaintiff here has no requirement to exhaust any administrative remedies.

■ The doctrine of primary jurisdiction has been referred to as

"a principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure." *Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952).

Thus, even where there is no exhaustion requirement, there may be sound reasons for a court to stay its hand in deference to a preliminary administrative determination.

The doctrine was

"developed by courts in order to avoid conflict between the courts and an administrative agency arising from either the court's lack of expertise with the subject matter of the agency's regulation or from contradictory rulings by the agency and the court. Under the doctrine, a court should refer a matter to an administrative agency for resolution, even if the matter is otherwise properly before the court, if it appears that the matter involves technical or policy considerations which are beyond the court's ordinary competence and within the agency's particular field of expertise." *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 496 F.2d 214, 220 (3d Cir. 1974).

The purpose of the doctrine is to seek an initial ruling from the administrative tribunal, not because that agency is inherently superior in its ability to handle the problem, but rather, because the court should have the advantage, in reaching its determination, of the contribution which the agency can make in its particular field of expertise. *Quigley v. Exxon Company U. S. A.*, 376 F.Supp. 342, 355 (M.D.Pa.1974).

"A determination that an agency has primary jurisdiction does not necessarily mean that the court will refrain from deciding the claim before it; it may mean only that the court will postpone its action on the case before it until after the agency has made a designated determination. But in some circumstances the primary jurisdiction of an agency may result in the court dismissing the claim before it. The Supreme Court has stated:

'The very purpose of providing either an exclusive or an initial and preliminary administration is to secure the administrative judgment either, in the one case, in substitution for judicial decision or, in the other, as foundation for or perchance to make unnecessary later judicial proceedings.' *Aircraft & Diesel Equipment Corp. v. Hirsch*, 1947, 331 U.S. 752, 767, 67 S.Ct. 1493, 1500, 91 L.Ed. 1796." *Id.* at 355–56.

Several factors are operative in the Court's examination of the primary jurisdiction

question: (1) whether the question at issue is within the conventional experience of judges, *Society of New York Hospital v. Associated Hospital Service of N. Y., supra,* 367 F.Supp. at 154, (2) whether the question at issue is peculiarly within the agency's discretion, *Far East Conference v. United States, supra,* 342 U.S. at 574, 72 S.Ct. 492, (3) whether there exists a danger of inconsistent rulings, *MCI Communications Corp. v. American Telephone & Telegraph Co., supra,* 496 F.2d at 223, and (4) whether a prior application to the agency had been made. *Id.* Also, while the courts possess the power to interpret a statute enacted by Congress, and the ability of the courts in this area is at least co-equal with that of the administrative agency, this is not necessarily so with regard to regulations formulated by the agency to implement congressional policy. *Id.* at 222.

In the instant case, the Court is inclined to defer to the FEA under the doctrine of primary jurisdiction. In this case, the issues before the agency are the same as those presently before the Court. The agency action was commenced first. The matter at issue involves not a statute, but rather a complex agency regulation regarding accounting procedures. The question is particularly within the agency's expertise and is similarly beyond the Court's normal scope. There has been no challenge to the Act itself, or to the authority of Congress to enact the Act, or to the authority of the President to delegate the appropriate power under the Act to the FEA. The Act clearly provides adequate mechanisms for both remedial action by the FEA and a private right of action by an individual. And, perhaps most important, the risk of inconsistent rulings by the agency and the Court is substantial.

In this instance, it is concluded that the better course for this Court to follow is to defer the initial determination of the proper accounting procedures to be followed to the FEA and to retain jurisdiction of the cause of action. In this manner, the rights of the parties are preserved, the will of Congress is carried out, and attention is paid to judicial conservation. Also, having reached this conclusion, there is no need for the Court to reach the question raised by the defendant as to the primacy of the proceeding in the New York State Supreme Court.

Two minor questions remain to be resolved. First, whether the FEA need be joined herein as a necessary party. In light of the Court's deferral to the agency, there would seem to be no sound policy reason for the Court to order that the agency be made a party at this time. The Court would note, however, that the request may be renewed at a more appropriate time in the future. In any event, the proper course to take would not be to dismiss the action for a failure to join the agency as the defendant suggests, but would rather be simply to allow an amendment of the complaint to bring the agency into the action. Second, there has been a request by the defendant to stay discovery in the action pending the outcome of this motion. This request is now moot.

Accordingly, the Court will stay the trial of this action until the FEA has had a chance to rule on the interpretation of its regulations with regard to the issues raised herein.

So ordered.